Lane McNAMARA, et al., Plaintiffs,

v.

BRE–X MINERALS LTD.,
et al., Defendants.

No. 5–97CV–159.

United States District Court,
E.D. Texas,
Texarkana Division.

Jan. 6, 1999.

H. Lee Godfrey, Charles Robert Eskridge, III, Susman Godfrey LLP, Houston, TX, Damon Young, Young & Pickett, Texarkana, TX, Edward Miller, A. Paul Miller, Miller James Miller Wyly & Hornsby, R. Paul Yetter, Yetter & Warden, Houston, TX, Michael

C. Spencer, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for Plaintiffs.

T. Richard Handler, Jenkens & Gilchrist, Dallas, TX, John L. Verner, Calvin Gibbs & Verner, Houston, TX, David Boies, Boies & Schiller, Armonk, NY, Robert E. Dodson, Gooding & Dodson, Texarkana, TX, Glen Carter Hudspeth, Texarkana, TX, Karen Patton Seymour, Tiffany M. Erwin, D. Stuart Meiklejohn, Sharon Nelles, Sullivan & Cromwell, New York City, Preston Worley McGee, Tyler, TX, Gary D. Grimes, David Gibson Paul, Grimes & Paul, Texarkana, TX, Johnny Paul Arnold, Texarkana, TX, David J. Beck, L. Nicole Batey, Eric J. R. Nichols, Beck Redden & Secrest LLP, Houston, TX, John Hess McElhaney, Locke Punell Rain Harrell, Dallas, TX, John David Crisp, Crisp Jordan & Boyd LLP, Texarkana, TX, Zack A. Clement, Linda L. Addison, William J. Boyce, Preston Worley McGee, Fulbright & Jaworski, Houston, TX, Robert M. Buschmann, Daniel R. Murdock, Winston & Strawn, New York City, Nicholas H. Patton, Patton Tidwell & Sandefur, Texarkana, TX, J. Hoke Peacock, II, Oragin Bell & Tucker, Beaumont, TX, Bruce Domenick Angiolillo, Simon A. Steel, Michael A. Berg, Simpson, Thacher & Bartlett, New York City, James N. Haltom, Patton Haltom Roberts McWilliams & Greer LLP, Texarkana, TX, Eric F. Grossman, Lewis B. Kaden, Lawrence J. Portnoy, Davis Polk & Wardell, New York City, for Defendants.

### ORDER

FOLSOM, District Judge.

The Defendants in this action have filed numerous motions to dismiss. This Order addresses only one of the issues raised in these motions: Does this Court have subject matter jurisdiction to hear the claims of the Canadian Plaintiffs who purchased their stock on Canadian exchanges? The Court finds that it does not.

---

1. Unless otherwise noted, these background facts are taken from the Plaintiffs' Second Amended

## I. BACKGROUND[1]

This is a securities fraud case. Seeking class certification, the fifteen named Plaintiffs are persons who purchased common stock of Bre–X Minerals Ltd. ("Bre–X") and/or Bresea Resources Ltd. ("Bresea") between January 17, 1994 and May 2, 1997. The Plaintiffs essentially allege that the Defendants made misrepresentations that inflated the value of these stocks. The Court will review here only general background facts and those facts which are relevant to the present inquiry regarding subject matter jurisdiction.

### A. Bre–X and Bresea

The central player in this action is Defendant Bre–X, a publicly traded mineral exploration corporation headquartered in Calgary, Alberta, Canada. Bre–X common stock was traded on the Alberta Stock Exchange at all times during the purported class period. The stock was traded on the Toronto Stock Exchange beginning April 23, 1996, and on the NASDAQ National Market beginning August 19, 1996. Defendant Bresea is a Canadian holding company which owns (or at least owned at one time) a twenty-five percent share of Bre–X.

In 1993, Bre–X acquired mineral rights in the Busang area of the East Kalimantan province of Indonesia. The Plaintiffs allege that during the purported class period, Bre–X and its insiders misled its stockholders and the public by falsely announcing increasingly larger estimates of a gold resource that it had discovered in the Busang area through exploratory drilling. In particular, the Plaintiffs accuse Bre–X of numerous misstatements in estimating the amount of gold at this site from 3 million ounces in 1994 to 200 million ounces in the spring of 1997. As a part of this giant hoax, Bre–X also allegedly tampered with core samples before they were sent to a laboratory for testing.

The increasing gold estimates allowed Bre–X and Bresea stock to sell at artificially inflated prices. Things went downhill, however, in March 1997, when an independent

---

Class Action Complaint, filed April 30, 1998.

mining consultant concluded that the prior estimates concerning the quantity of gold at Busang had been overstated because of invalid samples and improper testing of the samples. Stock prices began to fall, and Bre–X is now in bankruptcy.

### B. Other Defendants

In addition to Bre–X and Bresea, the Plaintiffs have named fifteen other Defendants. Eight of them are individuals who were Bre–X officers and/or directors ("Insider Defendants"). Defendants P.T. Kilborn Paka Rekayasa, Kilborn Engineering Pacific Ltd., and SNC–Lavin Inc. (collectively, "Kilborn Defendants") provided geostatistical services to Bre–X and issued reports to substantiate the claims of gold.

Defendant J.P. Morgan & Co., an American corporation, acted as a financial advisor to Bre–X beginning in approximately September 1996. Defendant Lehman Brothers, Inc., also an American corporation, issued some positive reports about the presence of gold in Busang and made profits selling stock to its customers.

Defendant Nesbitt Burns, Inc. is a Canadian stock brokerage that underwrote Bre–X stock and syndicated Bre–X private stock. Defendant Barrick Gold Corporation is a Canadian group that negotiated with Bre–X about the possibility of a joint venture for the Busang project.

### C. The Plaintiffs' Claims

The Plaintiffs are bringing four causes of action against the Defendants: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (found at 15 U.S.C. § 78j(b)) and Rule 10(b)–5 promulgated thereunder (found at 17 C.F.R. § 240.10b–5); (2) violations of § 20(a) of the Exchange Act (brought only against the Insider Defendants and Bresea); (3) negligent misrepresentation; and (4) common law fraud.

The Defendants have moved to dismiss these claims for various reasons. By this Order, the Court dismisses those claims

brought by the Canadian Plaintiffs who purchased their stock on a Canadian exchange (hereinafter the "Canadian Plaintiffs").[2]

## II. RELEVANT AUTHORITY

### A. Motion to Dismiss Standard

In reviewing the Defendants' motion to dismiss for lack of subject matter jurisdiction, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Communications Inc.,* 117 F.3d 900, 904 (5th Cir.1997). The Plaintiffs have the burden of proving the Court's jurisdiction. *Boudreau v. United States,* 53 F.3d 81, 82 (5th Cir.1995).

### B. The Reach of the Exchange Act

The Canadian Plaintiffs have accused the Defendants of violating Section 10(b) of the Exchange Act. This section forbids "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails" from using "any manipulative or deceptive device" prohibited by the SEC "in connection with the purchase or sale of any security." 15 U.S.C. § 78j.

With one exception not relevant here, "the Exchange Act does nothing to address the circumstances under which American courts have subject matter jurisdiction to hear suits involving foreign transactions." *Robinson,* 117 F.3d at 904–905. American securities statutes appear to be "designed to protect American investors and markers, as opposed to the victims of any fraud that somehow touches the United States." *Id.* at 906.

■ In certain circumstances, however, the reach of the Exchange Act may extend beyond the borders of the United States. This can occur when one of two tests is met. The "conduct" test "asks whether the fraudulent conduct that formed the alleged violation occurred in the United States." *Id.* at 905. The "effects" test "asks whether conduct out-

**2.** The record does note readily reveal which of the Plaintiffs are the Canadian Plaintiffs. The Court believes them to be as follows: John McCarthy, Marian McCarthy, Dennis Oliver,

Meissner Music Productions, Inc., and Alloxford Limited. However, this Order applies to all Plaintiffs who meet the above definition of Canadian Plaintiffs, even if they are not listed here.

side the United States has had a substantial adverse effect on American investors or securities markets." *Id.*

■ Only the conduct test is relevant to determining whether the Canadian Plaintiffs may bring their claims in an American court. These Plaintiffs obviously would not have standing to assert any adverse effect on American investors or securities markets. *See Koal Industries Corp. v. Asland, S.A.,* 808 F.Supp. 1143, 1155 (S.D.N.Y.1992). In order to satisfy the conduct test, the Canadian Plaintiffs must demonstrate that domestic conduct *directly caused* the alleged fraud. *Id.* at 905–906.[3]

As the Plaintiffs correctly note, the conduct test and the effects test may, in some circumstances, be considered jointly in determining jurisdiction. *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (2d Cir.). The case at hand, however, does not present one of those circumstances. *Itoba* involved a single, foreign plaintiff that purchased shares on a foreign exchange. *Id.* at 120, 123. The conduct test was applicable there to determine whether domestic conduct fraudulently induced that purchase. *Id.* at 122–124.

The effects test was also applicable in *Itoba* because the plaintiff, a foreign corporation, bought the stock for its American parent company. *Id.* at 124. The purchasing corporation was a wholly-owned subsidiary of the American company, and it was the latter which was ultimately left holding the bag. *Id.* Thus, it was appropriate to determine whether extraterritorial conduct contributed to what was, in the end, a domestic loss. There is no similar pass-through loss from the Canadian Plaintiffs to a domestic entity in the instant case. Though losses in the

instant case were clearly sustained by American Plaintiffs, those losses were independent and did not flow from the Canadian purchasers. The Canadian Plaintiffs cannot justify jurisdiction by bootstrapping on independent, American losses.

The Plaintiffs cite two cases for the proposition that the effects test should always apply to the claims of foreign Plaintiffs. These cases, however, do not stand for that proposition. In *Robinson,* the court discussed the conduct test but did not apply it because the English plaintiff did not argue its application on appeal. *Robinson,* 117 F.3d at 905. This is no way suggests that the court would have applied this test had it been argued. The court simply did not bother with the issue since it was not raised. Had the issue been raised, however, it is doubtful that the court would have applied the effects test unless some type of domestic loss had been shown. *See Id.* at 905 (The effects test "asks whether conduct outside the United States has had a substantial adverse effect on *American* investors or securities markets.") (emphasis added).

*Consolidated Gold Fields v. Minorco,* 871 F.2d 252 (2d. Cir.1989) is equally unhelpful to the Plaintiffs. There, the effects test was applied because a direct domestic loss was at stake. The inquiry was whether the alleged fraud had a direct financial effect on American shareholders of the foreign corporate plaintiff. *Consolidated Gold,* 871 F.2d at 261–263. In other words, the losses of the foreign plaintiff there were not bootstrapped to independent American losses, as the Canadian Plaintiffs are attempting to do here. Rather, the American losses in that case flowed directly from the losses of the foreign

---

**3.** The Plaintiffs suggest that *Robinson* requires only that the alleged U.S. conduct form a *substantial part* of the fraud in question, as opposed to requiring that it *directly caused* the Plaintiffs' losses. Though plausible on its face, the Court rejects this argument. The court in *Robinson* found that the conduct in question was both a substantial part of the fraud and a direct cause of the Plaintiff's injury. 117 F.3d at 907. Thus, the court was not directly faced with the question of whether both facets must be present in order to satisfy the conduct test. The court noted, however, that "[a] close examination of the Second Circuit's caselaw [which was adopted by the Fifth Circuit] reveals that the real test is simply

whether material domestic conduct *directly caused* the complained-of loss." *Id.* at 905 n. 10 (emphasis added). Moreover, the Second Circuit definition of the conduct test, as adopted by the Fifth Circuit in *Robinson,* clearly requires that the domestic conduct in question be (1) more than "merely preparatory" to the fraud; *and* (2) a direct cause of the losses in question. *Itoba,* 54 F.3d at 122. Finally, the Fifth Circuit in *Robinson* clearly rejected the view of the Third, Eighth and Ninth Circuits that, under the conduct test, the "domestic conduct need be only significant to the fraud rather than a direct cause of it." *Robinson,* 117 F.3d at 906.

plaintiff. Again, no such pass-through domestic losses have been demonstrated by the Canadian Plaintiffs.

The Court finds further support for rejecting the applicability of the effects test in *Kaufman v. Campeau Corp.*, 744 F.Supp. 808 (S.D.Ohio 1990). Facing facts strikingly similar to those in the instant case, the court in *Kaufman* found that it lacked subject matter jurisdiction over Canadian plaintiffs who were attempting to use American securities laws to recover losses sustained as a result of transactions on Canadian exchanges. *Kaufman*, 744 F.Supp. at 810. The court specifically rejected the effects test as a means of establishing jurisdiction:

> Nor is the exercise of subject matter jurisdiction over the Canadian investors' claims warranted under an effects test. Plaintiffs cite the unitary nature of the Canadian and domestic markets and the fact that defendants' stock was traded on an American exchange as bases for the exercise of jurisdiction over these claims. Defendants' action in Canada may have had an effect on the American securities market or on American investors who purchased stock during the class period. However, to exercise jurisdiction over the claims of Canadian investors based on acts or omissions committed within their own country would not further the purpose of the Securities and Exchange Act of protecting American investors and the American securities market. The mere fact that such conduct may have adversely affected American investors and markets does not justify extending the protection of the securities laws to foreign investors in this case.

*Id.*

The Court agrees with the reasoning in *Kaufman* and finds it applicable to the present inquiry. Accordingly, the Court will only address the conduct test in assessing the claims of the Canadian Plaintiffs.

## III. ANALYSIS

The Court finds that the Canadian Plaintiffs have failed to show that American-based conduct directly caused the alleged fraud of which they complain. The Plaintiffs' complaint makes no such showing in this regard. In subsequent filings, the Plaintiffs attempt to make this showing by pointing to various domestic activities of some of the Defendants. The following conduct, the Plaintiffs assert, satisfies the conduct test and thereby establishes this Court's subject matter jurisdiction:

1. J.P. Morgan and Lehman "were highly significant actors in perpetrating the fraud, were located in the U.S., and undertook substantial acts here."

2. "Although the most dramatic events occurred abroad—such as the salting of core samples in Indonesia—selling this stock to the financial community occurred in the U.S."

3. "Principally, hundreds of documents were filed with the SEC. That was particularly significant because relatively little information was required to be filed with Canadian authorities. The U.S. filing thus became the most reliable source of 'official' (albeit fraudulent) company information."

4. "Bre–X partnered with a U.S. company, Freeport–McMoran, to develop the Busang mine."

5. "J.P. Morgan was hired as Bre–X's 'financial advisor,' in the broadest sense. Lehman was a market maker, analyst, and unflagging cheerleader.... These activities were crucial components of defendants' fraud and directly caused the losses to the class...."

6. "U.S.-based defendants J.P. Morgan and Lehman Brothers made repeated representations concerning Busang, all of which were calculated to influence the investing public. In addition, virtually all defendants caused false and misleading representation concerning Busang to be disseminated via wire and mail in the U.S., including countless press releases, news articles, SEC filings, and the BRE–X website."

7. "[O]n several occasions, two or more of the defendants traveled to the U.S. for the purpose of furthering the Bre–X fraud."

Even if the Court assumes that these activities were indeed a substantial part of a fraudulent scheme, the Canadian Plaintiffs

still have failed to show how their losses were *directly* caused by these activities. Not a single Canadian Plaintiff has alleged that he or she relied on (or was even aware of) any statements, reports or filings which emanated from the United States. The fact that J.P. Morgan advised Bre–X on financial matters is at best an indirect cause of the Canadian Plaintiff's losses. In short, the Canadian Plaintiffs have failed to link up any domestic conduct of the Defendants with their losses. Therefore, the conduct test has not been met, and this Court finds that it lacks subject matter jurisdiction of the claims of these Plaintiffs.

## IV. CONCLUSION

Because the Canadian Plaintiffs have failed to show that the domestic conduct of any Defendant directly contributed to the losses of which they complain, the Court finds that it lacks subject matter jurisdiction over their Exchange Act claims. Because that leaves the Canadian Plaintiffs with no federal question before this Court, their state common law claims must also be dismissed. Therefore, it is hereby

ORDERED that all claims brought by the Canadian Plaintiffs are hereby DISMISSED. Accordingly, it is hereby

ORDERED that the following motions to dismiss are GRANTED IN PART: Lehman Brothers' Motion to Dismiss (Docket # 47); J.P. Morgan's Motion to Dismiss (Docket # 44); Kilborn Engineering Pacific's Motion to Dismiss (Docket # 50); Nesbitt Burns' Motions to Dismiss (Docket # s 78 and 241); Felderhof's Motion to Dismiss (Docket # 85); P.T. Kilborn Pakar Rekayasa's Motion to Dismiss (Docket # 232); Bresea's Motion to Dismiss (Docket # 202); Barrick's Motion to Dismiss (Docket # 255); and Francisco's Motion to Dismiss (Docket # 248). To the extent that any other motions not listed here address the instant subject matter jurisdiction question, those motions are also GRANTED IN PART with regard to the issue that is the subject of this Order.